# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs August 24, 2010

## STATE OF TENNESSEE v. DYRON NORM YOKLEY

**Appeal from the Criminal Court for Hamilton County**
**No. 269159     Barry A. Steelman, Judge**

---

**No. E2009-02646-CCA-R3-CD - Filed May 20, 2011**

---

The Defendant, Dyron Norm Yokley, was convicted of second degree murder, for which he received a thirty-five-year sentence as a Range II, violent offender.  The Defendant appeals, contending that (1) the evidence is not sufficient to support the conviction, (2) the trial court erred in denying his motion to suppress his four pretrial statements, (3) the State violated his due process rights by failing to update its discovery responses, (4) the trial court erred in allowing the jury to view the scene, (5) the trial court erred in admitting evidence of the Defendant's affiliation with the Vice Lords gang, and (6) the trial court erred in imposing a lengthy sentence.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which THOMAS T. WOODALL, and ALAN E. GLENN, JJ., joined.

Ardena J. Garth, District Public Defender; Richard Kenneth Mabee (on appeal), Assistant District Public Defender; and Mary Ann Green and Karla Gothard (at trial), Assistant District Public Defenders, for the appellant, Dyron Norm Yokley.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; William H. Cox, III, District Attorney General; and Boyd Patterson and C. Matthew Rogers, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case relates to the shooting death of Tyus Steele.   At the trial, Corey Jones testified that he had been friends with the victim since childhood.  He said that on the Saturday before the victim's death, the victim was at Mr. Jones's mother's home and won about $350 from him in a card game.  He said that he and the victim rode around in a rental

truck that evening, that they picked up a friend named Kesha, that they smoked marijuana, and that they went to his cousin's house to play in another card game. He said that in both card games, they were playing for bets of $5 and $10 a hand and that $100 bills were not involved. He said he last saw the victim around 5:00 or 6:00 a.m. on Sunday, January 28, 2007, when they returned to Mr. Jones's mother's house. Mr. Jones said that the Defendant was driving Mr. Jones's rental truck and that the Defendant gave him $20 to use the truck longer, even though the Defendant had two cars of his own.

Sasha House testified that the Defendant was the father of her child. She said she met the Defendant when she was seventeen years old and that she did not know he was married until after she was pregnant. She said that the Defendant told her he wanted to purchase marijuana and that she contacted a female friend who told her how to contact the victim. She said she arranged for the Defendant to purchase the marijuana from the victim. She said she drove the victim to Pine Breeze Road, a secluded area, where the victim wanted to meet. She said the victim wanted her to arrive with him because he did not know the Defendant. She said that because she was hungry and did not have much gas, the Defendant gave her $20 and the keys to his nearby apartment and told her to get his gas can in the event she ran out of gas before she reached the gas station. She said that she went to the Defendant's apartment and a gas station and that when she returned to Pine Breeze to give the Defendant his keys, she did not see anyone. She said she drove around, tried to reach the Defendant by telephone, and searched on foot without locating anyone.

On cross-examination, Ms. House testified that the Defendant stated he wanted to buy about a pound of marijuana. She said that the victim did not answer his phone when she called him and that her friend who knew him placed a three-way call in order for her to talk to the victim. She said that she talked to the victim on Saturday and that the meeting time was set for early Sunday because she wanted to attend church. She admitted that while she was away from the scene, the Defendant called her and told her, "Don't come back up here." She said that the Defendant was out of breath during this call and that he hung up before explaining.

Ms. House acknowledged lying to a police officer at the scene. She said that as she searched for the Defendant, she saw a police officer at the upper entrance to a park and that she drove to another entrance. She said that at the second, lower entrance, she saw several police officers and an ambulance. She said she told an officer who questioned her that she needed to enter the park to use the restroom.

Ms. House admitted that she lied to the police when she was questioned later at the police department. She claimed she was scared. She admitted that her mother was present and accused her of lying. She said that she eventually admitted her relationship with the

Defendant but that she did not admit arranging a drug deal. She said the officers threatened her repeatedly that she would have her baby in prison. She said she was no longer romantically involved with the Defendant but acknowledged she took their infant to visit him.

Ms. House admitted that she avoided defense counsel until they went to her workplace and that she lied when defense counsel asked her about the crime. She said she lied because she was scared for herself and her child, not to help the Defendant. She said she later contacted defense counsel when the district attorney tried to contact her. She said she was afraid she would be arrested. She admitted she first lied when the district attorney interviewed her in defense counsel's office but said she eventually gave a truthful statement that was consistent with her testimony on direct examination.

On questioning by the court, Ms. House testified that the keys the Defendant gave her included keys to his apartment and car and that she took them home and misplaced them. She said she did not discuss the price of the marijuana with the Defendant. She said she had no idea what was going to happen after she left the victim at Pine Breeze Road.

On redirect examination, Ms. House testified that she had known the Defendant since August 2006 and dated him since November 2006. She denied that she and the Defendant planned to rob the victim. On recross-examination, Ms. House said that she picked up the victim at his apartment and that she left him near the Defendant's truck. She referred to photographic exhibits and explained the route she traveled. She said she saw a light-colored car next to a police car when she returned to the park's upper entrance.

On additional questioning by the court, Ms. House testified that only the victim, the Defendant, and she knew about the drug deal. She said the victim specified the place they would meet and asked that she drive him there. She denied that she and the victim planned to rob the Defendant. She said that after the Defendant went to jail, he told her they should no longer be friends. She said she was unaware the Defendant had a gun when she brought the victim to the scene. She said that when she returned to the scene, she looked for both the Defendant and the victim. She said she planned to take the victim back to his apartment.

On further redirect examination, Ms. House testified that she and the Defendant met in her neighborhood in August 2006, and that they were talking almost daily by mid-September. She said that their relationship progressed to being more serious in November and December but that "it got a little shaky in January." She said that the Defendant began retreating from the relationship, that they had telephone conversations that ended negatively, and that she visited him less. She acknowledged that the Defendant told her earlier in the relationship that he would leave his wife to be with her but that by January, he told her he

would not leave his wife. She said she was sad and wanted to be with the Defendant. She acknowledged that she would have done almost anything to keep the Defendant happy and that she arranged the drug transaction at his request.

Ms. House testified that she was granted immunity from prosecution for any drug offense related to the events in question. She said she did not recall the prosecutor telling her that she would not be prosecuted if there were evidence that she was involved in a plan to murder the victim. On further recross-examination, Ms. House again denied that she "set [the Defendant] up." When questioned again by the court, Ms. House denied that she was to receive any money or marijuana for arranging the drug deal.

Henry Thomas McCurdy testified that he visited his daughter who lived in Hamilton County in January 2008. He said that he was retired from the Navy, that he had received firearms training and had some knowledge of firearms, that he owned three guns, and that he had a concealed carry permit. He said he and his wife went with his daughter to a park to walk her dog around mid-morning on January 28. He said it was cold and clear. He said that he was standing outside his daughter's van when he saw a dark-skinned man walk toward him from a wooded area and then slip or stumble once or twice. He said the man could have been Hispanic or black and wore dark clothing with a hood over his head that obscured his facial features. He said that the man raised his right hand and yelled "help" or "wait" and that he heard a gunshot. He said he looked around and saw another man with a gun. He said that this man also wore dark clothing with a hood over his head but that he did not notice this man's skin color because he focused on the gun. He said the men were approximately twenty to forty feet away from him. He said he ran to his daughter's van and told her to drive away. He said he heard a total of three or four gunshots that were not fired in rapid succession. He said that after his daughter called 9-1-1 and reported the incident, they went to the Red Bank Police Department, talked to police officers, and then returned to the scene with some of the officers.

Mr. McCurdy testified that he never saw the Defendant or the victim before January 28. He said he was not involved in a plan to rob the Defendant. He said that he did not see the victim holding a firearm and that if his daughter said "they were shooting each other" on the 9-1-1 call, it was a misstatement due to excitement. He said he did not hear the victim or the Defendant speak other than the victim's saying "help" or "wait." He admitted that he had a hearing disability and did not wear a hearing aid at the time.

The jury was taken to the crime scene. A police officer stood at various locations that were the subject of earlier testimony as the court identified the locations to the jury.

After the jury viewed the scene, Mr. McCurdy resumed his direct examination testimony. He stated that he was present during the jury's visit to the scene and that he observed two differences between the scene at the time of the crime and the jury view – the foliage was different because it was not the same time of year and a gravel parking lot had been paved. Using photograph exhibits, Mr. McCurdy identified locations at the scene where he saw the events about which he testified earlier.

On cross-examination, Mr. McCurdy acknowledged telling the police that the victim did not appear to be in distress before the gunshot. He said he thought the victim stumbled because of the terrain. He said that when the victim raised his hand and spoke, the victim's other hand was at the victim's side and was not holding anything. He said that he did not notice whether the victim's pants were below his waist but that the victim's movement did not appear to be hampered by clothing. He said that when he returned to the scene with the police, he was the first person who saw the victim's body down a hill.

On questioning by the court, Mr. McCurdy testified that he did not know whether any shots were fired at him. He said he did not see the victim running before the gunshots began. He said he had no idea from which direction the shooter came. He said he had good vision. He said that the time between first seeing the victim and the victim's raising his hand was "anywhere from a couple of minutes to five minutes." He said he never saw the victim look back.

Mary Alice McCurdy testified that she went with her daughter and her husband to the park on January 28, 2007. She said that she was sitting in the middle seat on the passenger's side of her daughter's van and looking at her husband outside the van when she saw a man running up a slope toward the van with another man who appeared to be chasing him. She said the first man waved his hand and yelled "help" or "wait" and that she heard a gunshot within a minute. She said both men wore "hoodies" that obscured their faces. She claimed that she heard two or three gunshots and that she heard the last gunshot as they drove away. She said the conditions were cold and clear. By photograph exhibits, she identified locations where she saw these events.

On cross-examination, Ms. McCurdy acknowledged that a few days before her testimony, she returned to the scene with the prosecutor. She also acknowledged that she met with the prosecutor to discuss the facts of the case. She said she and her husband discussed whether they were doing the right thing by becoming involved.

On redirect examination, Ms. McCurdy testified that no one from the district attorney's office told her how she should testify. She said she did not know the Defendant and did not have any ties to the victim. She said that she was bothered by her and her

family's inability to help the victim but that she believed they would not be alive had they not fled.

On questioning by the court, Ms. McCurdy testified that she did not see whether either man carried anything. She said they were in the park five to ten minutes before she heard the gunshots. She said the victim yelled "help" or "wait" three or four times.

Terri Blanchard testified that she was only familiar with White Oak Park from walking her dog there. She said she was in the park with her parents and her dog on January 28, 2007. She said she was bent over outside the van trying to untangle the dog's tags from its leash when she heard someone yell "help, wait" and gunshots. She said her father dove into the van and told her to drive away because someone was shooting a man. She said she drove away quickly. She admitted she did not see the men outside the van.

On cross-examination, Ms. Blanchard acknowledged that she told the 9-1-1 operator that a black man and a Hispanic man were shooting at each other, but she said that she was relaying information from her father. She said her father was positive that one of the men had a large revolver. She said she first spoke with a police officer within ten to fifteen minutes of the incident. She said that she gave a statement at the police station but that she did not return to the scene with the officers and her parents.

On redirect examination, Ms. Blanchard testified that she was still excited and confused when she made the 9-1-1 call. She said her father stated that there was one gun, that it was a .45 caliber weapon, that one man was shooting, and that the other man was running from the shooter. The 9-1-1 tape was played for the jury.

On questioning by the court, Ms. Blanchard testified that the victim yelled "help, wait" before the shots began. She said that she tried to untangle her dog's collar for five to seven minutes and that the dog did not bark during the incident.

Red Bank Police Officer Jeff Chastain testified that on January 28, 2007, he was dispatched to the scene of the victim's homicide based upon a report that two men were shooting at each other. He said he first went to the police station to talk to a man and two women who were the reporting parties. He said the man advised him that a large caliber weapon was involved. He said the witnesses accompanied him to the scene and identified where events occurred. He said Officer Spandau had already closed the park's gate when he arrived.

Officer Chastain testified that he found an Explorer parked opposite the flow of traffic at the entrance of the Hill Point Subdivision. He said that as he parked his patrol car, he saw

the Defendant standing at the back of his patrol car. He said that he jumped out of his patrol car quickly, that he ordered the Defendant to put his hands on the car, and that the Defendant complied. He said this took place about 11:07 a.m. Officer Chastain testified that the Defendant asked for assistance because he ran out of gas. Officer Chastain said he handcuffed the Defendant, told him he was being detained but not arrested, patted him down for weapons, and placed him in the back seat of his patrol car. He said the Defendant was dressed in dark pants and a white sleeveless "muscle shirt," which he thought was unusual because there were snow flurries that day. He said the Defendant's breathing and body temperature were "slightly elevated." He said the Defendant expressed surprise when Officer Chastain commented on a bleeding cut on the Defendant's face. He said that the blood coming from the cut was minimal and that the Defendant said he hit his head on a wall.

Officer Chastain testified that he saw a pile of muddy, grassy clothing behind and to the side of a subdivision sign that was about twenty-five feet from the Explorer. He identified sweat pants and a hooded sweatshirt in a photograph as the clothing he saw. He said he checked the clothing for a weapon, returned to his patrol car, patted down the Defendant a second time, and placed an audio recorder in the car with the Defendant. The recording was played for the jury. Officer Chastain said that the Defendant complained of thirst and that he rolled down a window to help the Defendant cool down. He said he was in or near his patrol car observing the Defendant for two to four hours.

On cross-examination, Officer Chastain acknowledged that the present case was the first shooting death in his eight months of employment with the Red Bank Police Department. He said that the Defendant approached him when he first arrived at the scene and that the Defendant did not try to hide. He said that he did not draw his weapon, that the Defendant put his hands on the patrol car's trunk as instructed, that the Defendant identified himself, and that he did not find a weapon when he conducted the patdowns of the Defendant. He said that all three of the witnesses returned to the park with him. He said he did not remember the time at which he took the Defendant to the police station.

Officer Chastain testified that at the police station, he secured the Defendant to a bench that was attached to the wall. He said he was at the police station until 9:00 p.m., watching the Defendant and writing his report. He said that during this time, Chief Larry Sneed and Detective Steve Dillard collected evidence from the Defendant for a gunshot residue test. He said he did not recall putting the Defendant in the holding cell. He said he recalled the Defendant's being allowed to use the restroom.

On redirect examination, Officer Chastain testified that at first, the Defendant was excited and said he needed to get gas and leave. He said the Defendant said something about his wife and children being at church. He said that the Defendant became calm later and

attempted to sleep in the patrol car. On recross-examination, Officer Chastain testified that Officer Shelton commented about a car he saw and that the Defendant spontaneously stated that if the car was gray, his girlfriend was in the car.

On questioning by the court, Officer Chastain said the park's gates were already closed when he arrived. He said that he did not look inside the Explorer and that he thought it was locked. He denied that the Defendant claimed to be locked out of the Explorer. He acknowledged that he did not find any money, drugs, or keys on the Defendant, but he said that the patdowns he performed of the Defendant were not to locate these types of items.

Red Bank Police Chief Larry Sneed testified that this was the first homicide for his department since he became chief in 2003 but that he had investigated homicides in his previous employment as a detective in the major crimes division of the Hamilton County Sheriff's Department. He said that he was in church on the Sunday morning of the crime in this case, that he went to the scene after an officer called him, and that he stayed there the rest of the day. He said that when he went to his office around 8:00 p.m., the Defendant was in custody as a potential suspect.

Chief Sneed testified that the Defendant was advised of his Miranda rights and chose to make a statement. He said the Defendant claimed to have gone to the park to meet a woman named Sasha and to have run out of gas. He said the Defendant reported calling Sasha on his wife's cell phone and locking himself out of his truck. He said he thought the Defendant was candid with him. He said the Defendant was wearing a t-shirt and dark pants.

Chief Sneed testified about the scene by referring to photograph exhibits. He said the victim was found face down with a bloody wound behind the ear. He said there appeared to be an exit wound on the right side of the victim's face. He identified a photograph taken after the victim was turned over. He said he thought the cell phone placed on the victim's chest in this photograph was underneath the victim's body before it was moved. He identified another photograph in which the cell phone was near the victim's hand. He did not recall that any firearms were recovered from the victim's body or nearby. He identified a photograph of the victim's hooded jacket, which he said had a hole from a gunshot, and a photograph depicting a bullet wound to the left side of the victim's stomach.

Chief Sneed testified that the Defendant was calm during the interview. He described the location of several gas stations near the park. He noted that the Defendant claimed to have gone down the hill from the Explorer and then to have gone back up the hill, rather than continuing toward the gas stations or the Defendant's apartment.

On cross-examination, Chief Sneed acknowledged that he took a general statement from the Defendant, not a confession. He said he spoke with the Defendant only one time, on January 28, 2007. He acknowledged that he never told the Defendant a murder occurred. He admitted that the three officers who were on duty on the morning of the crime were not members of the Major Crimes Unit and that he did not request assistance from the Tennessee Bureau of Investigation, the Chattanooga Police Department, or the Hamilton County Sheriff's Department. He said Red Bank had a five-officer Major Crimes Unit. He admitted that the hill at the scene was not searched until the day after the crime. He said it appeared that the victim was shot in the head after he had already been fatally wounded, but he admitted that this was his own speculation. He said they found a projectile near the body. He said that the police determined that a murder occurred and that the Defendant was the perpetrator.

On questioning by the court, Chief Sneed testified that he did not tell the Defendant why the Defendant was brought to the police station but that someone informed the Defendant of the reason before Chief Sneed talked to him. On further cross-examination, Chief Sneed testified that a "dime bag" of what appeared to be marijuana and some money were found near the victim's body. He said he did not give the Defendant any food. On redirect examination, he said the holding cell had bathroom facilities and a sink with hot and cold water. He admitted that he did not know whether the Defendant was ever confined in this cell. He said the Defendant did not appear to be in any distress during the interview.

Red Bank Police Detective Ike Cooper testified that on January 28, 2007, he received a text message from Detective Hope during church and that he arrived at the park about 11:25 a.m. He said that he was at the park most of the day and that it was around twenty-eight degrees and wet but not icy. He said he photographed the scene, evidentiary items, and the victim's body. He said he observed a shell casing, a small bag of marijuana, and a coin near the victim's body. He identified photographs taken at the scene of these items. He said he saw the victim's pants at the victim's hips in a style favored by some young men and which sometimes exposed the underwear. He said the Defendant stated that the victim fell down two or three times because his pants came down. He said the victim had a lanyard with a cell phone attached to it around his neck. He said that the medical examiner found the following items with the victim's body: clothing, a black lanyard, a necklace, a driver's license, a Social Security card, $400 cash, and two Bic lighters.

Detective Cooper testified that on January 29, 2007, keys were recovered at the park and that they were given to him. He said he determined that they were the keys to a 2006 Suzuki rental car parked at the victim's apartment. He said they searched the victim's apartment and took some bed sheets, a mattress cover, cigarette butts, and "vehicle papers."

Detective Cooper testified that he was at the scene all day on January 28 until he went to the police station around 8:00 p.m. He said he interviewed the Defendant that evening. A video recording of the interview was shown to the jury and introduced as an exhibit. In the statement, the Defendant claimed he met the victim for the first time on January 28, although he acknowledged knowing the victim's reputation. The Defendant stated that he met the victim to make a drug purchase but that he became afraid the victim was going to rob him. He said that he and the victim were outside their cars; that the victim said he was going to come back; that the victim hit him with a rock; that he fell down; that the victim started running downhill toward another man and a shiny, sky blue van; and that he thought this man was part of the robbery. He said the other man was white or light-skinned and had the side of the van open, and "was 'come on.'" He said he chased the victim and shot at him three or four times. He said he was mad and thought he could not "go away empty-handed." He said the victim fell down a few times. The Defendant stated that he could show the police where to find the gun at the scene.

Detective Cooper testified that he did not collect money from the Defendant. He said there were two numbers for the amount the authorities seized, $1,000.45 and $1,045.25. He later said the amount recorded on the evidence bag was $1,140.25 but that when he counted the currency, it totaled $1,100.25. He said that as the officer in charge of the investigation, he was ultimately responsible for the error. He said other officers recovered a $20 bill by itself and another $300 in $20 bills from the crime scene. He said that the Defendant's truck was not searched until after a search warrant was obtained and that the truck was towed to the police impound lot.

On cross-examination, Detective Cooper testified that the Defendant never told him he took money or car keys from the victim, although he said he never asked the Defendant if he took anything. He admitted that Sergeant Dillard, Sergeant Lamance, and he were at various times each the lead investigator for the crime. He acknowledged that fingerprint evidence was not collected from the key ring tag found at the scene. He admitted that after the Defendant's first court appearance, he never asked the Defendant's attorney if he could question the Defendant further.

Detective Cooper admitted that he "made up [the] difference . . . out of [his] own pocket" in the discrepancy between the two amounts of cash reported as found on the Defendant. He said he placed the $40 he added into a separate evidence bag, sealed it, signed it, and stapled it to the evidence bag containing the currency recovered from the Defendant.

Detective Cooper admitted that he resigned from his previous employment with the Chattanooga Police Department after an internal affairs investigation. He said that he was working "deep cover" cases involving vice and narcotics, that he had been the subject of

several "death contracts," and that he chose to resign after he "couldn't get any backup from the internal people." He acknowledged that he also had been employed with the Hamilton County Sheriff's Department but resigned before the sheriff took any action related to findings of an investigation of Detective Cooper for falsifying documents.

Detective Cooper testified that the Defendant was "a money man" who was a facilitator of drug transactions but did not carry drugs. He said that it was typical in the drug trade for one person to meet and screen the buyer while a second person working with the seller held the drugs. He acknowledged that Officer Spandau did not question or detain an approximately thirty-five-year-old African-American man who was sitting in a car at the park's upper gate within a minute of Officer Spandau's arrival as the first officer on the scene after the 9-1-1 call reporting gunshots. He noted that this took place before the victim's body was found. He admitted that despite other officers having obtained license tag information for this man, he never tried to contact him.

Detective Cooper acknowledged that this was the first homicide case for which he was in charge of the investigation. He admitted that he did not place flags near some of the items of evidence before taking photographs, nor did he make notes about the items that flags marked.

Detective Cooper testified that he took the Defendant's statement about fifteen minutes after his arrival at the police station on January 28 around 8:00 p.m. He acknowledged his previous testimony that he did not talk to the Defendant until 9:30 or 10:00 p.m. He denied taking the Defendant's statement in the presence of Chief Sneed or Detective Lemance. He identified his signature on the "certification" of Detective Lamance's signature on the Defendant's <u>Miranda</u> rights waiver form. The form contained times of the Defendant's signatures as 8:14 and 8:15 p.m. Detective Cooper said he did not recall adding his signature to this form at a later time. He admitted that he did not think the Defendant was aware that the statement was videotaped. He acknowledged that before the video recording was activated, he told the Defendant that Ms. House was being uncooperative. He said that the Defendant stated, "There was no need for no more lies," and that the Defendant wanted to talk to Ms. House face-to-face. He said the Defendant claimed that Ms. House was not present when the victim was shot. He admitted he did not talk to Ms. House again following the Defendant's statement that there did not need to be any more lies.

Detective Cooper testified that did not know when the Defendant learned that the victim died or that the white man in the van was not an associate of the victim's. He acknowledged that the dispatcher's log reflected that the 9-1-1 call was received at 10:46:33 a.m., that Officers Spandau and Shelton stopped a white Honda in the park's upper parking lot at 10:50:57 a.m., and that the officers released the Honda at 10:52:18 a.m.

-11-

On redirect examination, Detective Cooper identified two evidence bags containing currency. He stated that one contained the currency taken from the Defendant and the other contained the $40.25 he added to account for the discrepancy in the amount recorded as the total of the Defendant's money. He said the Defendant never mentioned anything in his statement about a black man in a car. On recross-examination, Detective Cooper acknowledged that the upper parking lot of the park near the gate could not be seen from the area of the woods where the body was found.

On questioning by the court, Detective Cooper testified that no wallet was found in the victim's possession and that the cash was in the victim's pocket. He said he described the victim as a "facilitator" of drug transactions based upon his past encounters with the victim. He said he had no knowledge of the victim's having been a gang member. He said that the clothing found on the ground near the subdivision sign was not tested because it was thought to be the Defendant's and that the victim's clothing was not tested because the medical examiner did not think it was necessary. He said the substance that appeared to be marijuana was not tested because no one was charged with a marijuana crime. He said that a pound of marijuana was not recovered and that there was no determination whether it ever existed.

David Spandau testified that he recently resigned from the Red Bank Police Department but that he was working on January 28, 2007, and that he was the first officer to arrive at the park after shots were reported. He said he entered the park's west gate and drove to the upper parking lot, where he saw a white Honda Prelude. He said that an African-American man who was about thirty-five years old sat inside the car for a few minutes, talked on a cell phone, and started to drive away. He said he used his public address system to stop the man, who complied. He said that the man was wearing dress clothing and a trench coat and that he assumed the man might be dressed for church. He said that the man said he had not been the person who called 9-1-1, that he had not seen anyone else in the park, and that he had not heard any gunshots. He allowed the man to leave and closed the park's west gate. He recalled that the man had a Marine Corps specialty license plate. He said he checked the registration for the license plate before he approached the car, but he did not recall the owner's name.

Mr. Spandau testified that he asked Officer Chastain, who was in contact with the people who made the 9-1-1 call, to have these eyewitnesses return to the park. He said a man whose name he could not recall arrived and told him he saw a man come out of the woods waving his arms and yelling to get their attention. He said the man reported seeing a second man run out of the woods and shoot the man who was waving his arms. He said that the man came to the park alone and that he thought the man had taken the female eyewitnesses home. He said that as the man pointed out locations to him, he saw a body lying face down on a

hillside.  He said that he pulled down the victim's hoodie, which was around the victim's neck, in order to check for a pulse and that he saw a wound below the victim's ear.

Mr. Spandau testified that he went to the park on January 29 around 9:30 or 10:00 a.m.  He said he was called to the park because his car had a protective divider behind which the Defendant could be confined.  He said he talked to the Defendant "the entire time."  He described the Defendant as cooperative and concerned about finding the gun.  He said the Defendant told him the following:  The Defendant met the victim at the top of the hill behind a rock wall, but the Defendant did not say why they met.  The Defendant had a feeling the victim was about to rob him, and after a minute, the victim picked up a rock and hit the Defendant in the head, knocking him backwards.  The Defendant took out his gun and pointed it at the victim, who ran.  The Defendant chased the victim down the hill.  The Defendant wanted to shoot but not kill the victim.  When they reached a clearing, the victim waved his arms and tried to get the attention of people in a van across the ravine.  The Defendant was angry because he thought "he was being set up" and realized he would have to kill the victim.  The Defendant did not state that he was afraid.  The victim fell twice, and after the second fall, the Defendant walked to the victim and shot the victim in the head.  The Defendant ran back into the woods.

Mr. Spandau testified that the Defendant seemed sincere when the Defendant said he did not realize that the people in the van and the victim did not know one another.  Mr. Spandau said that he informed the Defendant the people in the van were not with the victim, that the Defendant was quiet for a minute, and that the Defendant said, "Oh, man, I feel bad now."  Mr. Spandau said that he told one of the detectives what the Defendant told him, but he could not recall which detective he told.  He said the detective told him not to worry about writing a report about the Defendant's statements because they already had the information.  He said he did not make a written record of the Defendant's January 29 statement until the prosecutor requested after a suppression hearing that he do so.

On cross-examination, Mr. Spandau testified that he created the written statement about the Defendant's January 29 statements on the day after working an overnight shift.  He admitted that there were instances in this report where he referred to the Defendant by the victim's name.  He acknowledged that he created his written statement about his observations and actions on January 28 on the same day they occurred.

Mr. Spandau testified that he did not remember whether he orally reported that the Defendant "walked up" and shot the victim in the head, but he said he knew he reported that the Defendant shot the victim in the head.  He acknowledged that the male eyewitness said the Defendant was chasing the victim and that he believed this meant they were running.  He said that a car passed by during his stop of the white Honda at the Pine Breeze Road entrance

to the park and that Officer Shelton stopped this car a few minutes later at the lower west Midvale park entrance. He said that Sasha House drove the car Officer Shelton stopped.

Mr. Spandau testified that he began compiling the crime scene log and was in charge of it for about thirty minutes, after which he began guarding the lower gate. He said he typically began the crime log at the scene and later incorporated the times that people arrived by referring to the dispatch log. He said that he was concerned because he intended to provide the information from the dispatch log in the present case and that he assumed someone else did it because no one later asked him about it. He said that he saw Chief Sneed talking to the male eyewitness but that he did not listen to their conversation.

In response to a question submitted by the jury, the parties stipulated that Mr. Spandau's resignation was unrelated to the present case. On questioning by the court, Mr. Spandau testified that he did not initially file a supplemental report because the department was such that "you don't do anything extra unless you're directed to do it." He said the entire park was considered a "hot zone," meaning it was within the area where the police searched for evidence. He said everyone who was listed on the crime scene log had been inside the "hot zone." He said that when he first saw the Honda Prelude, he could not tell whether its engine was running.

On redirect examination, Mr. Spandau testified that despite his failure to create a contemporaneous supplemental report about the Defendant's January 29 statements to him, he was confident in the accuracy of his testimony about those statements. On cross-examination, he testified that he did not think the man driving the Prelude was aware of his presence when he began observing the car. He said the Prelude was near an island in the upper parking lot. He said that he asked the Defendant whether the Defendant would repeat his actions if he were again in the same situation and that the Defendant replied, "I don't know." He admitted that the Defendant appeared frustrated when the police took a long time to find the weapon at the park and that the Defendant expressed his hope that the police believed him.

Red Bank Police Detective Steve Dillard began his testimony by admitting that he had been untruthful during an internal investigation that took place in his previous employment with the Hamilton County Sheriff's Department. He said he had since been employed with the Red Bank Police Department for eight years and four months. With respect to the present case, he testified that he was called to the scene by Chief Sneed. He identified photographs he took and referred to them as he testified about the locations where evidence was found. He said that he was the one who found the keys and that there was a trail of $20 bills near the keys. He said the currency totaled $300. He said there was a black "do rag" on a branch in the woods near a $20 bill. He said they also recovered a weapon and a magazine near each

-14-

other in the woods. He identified the victim's clothing, which was admitted as an exhibit. He identified other exhibits that he said he collected, including the green leafy substance that appeared to be marijuana and a cartridge casing.

On cross-examination, Detective Dillard testified that he did not create a diagram or make notes of his observations at the scene. He admitted that he was testifying from memory and that his testimony might not be precise about the relative locations at which some of the items were found. He admitted that the car keys were not "logged in" as evidence and that had they been included in the log, this would be the best information about where they were found. He acknowledged that the hillside depicted in the photographs was very steep and that the scene's present appearance was very different than at the time of the crimes due to the difference in the foliage.

Detective Dillard testified that he was employed by the Hamilton County Sheriff's Department for eleven years and seven months and that his employment was terminated after the investigation in which he was not truthful. He acknowledged that he worked as a patrol officer and a DARE officer for many years of his employment and that this was his first homicide case. He acknowledged that it was not typical for items of evidence to be brought to court in a sealed container. He acknowledged writing Detective Lamance's name on the evidence bag for the shell casing, even though Detective Dillard collected it. He said he mistakenly thought this was proper because Detective Lamance was the lead investigator at the time. He admitted he did not write the information on the evidence bag at the scene but did it at the police station after he left the scene. He clarified that the "do rag" and the single $20 bill were not near the trail of $20 bills and the car keys.

On questioning by the court, Detective Dillard testified that did not send any items of evidence for forensic testing. He said that there were bullets in the clip of the gun when it was recovered and that he thought there were three. He said that he was never the lead detective and that his duties were limited to collecting and photographing the evidence. He admitted that there was a period of time on the night of January 28-29 when the park's entrances were not guarded, although the gates were locked.

Red Bank Police Corporal Michael Ray testified that he and Detective Dillard completed a survey of the scene using the total station forensic mapping system. He said that the system measured distance, angles, and elevation and that the measurements were recorded by the equipment and then a map was generated by computer. He said that he was trained to use the equipment and that the present case was the first or second crime scene at which he used it. Testifying while referring to a map, he identified locations where items of evidence were found. He said the shell casing was 3'1" from the top of the victim's head, the marijuana was 4'7" from the head, and the coin was 2'4" from the head. He said the body

was located 147' from the center of the parking lot where Mr. McCurdy had been. He said the area where Mr. McCurdy first saw the victim come out of the woods was 327' from the location of the body and 470' from the center of the parking lot.

On cross-examination, Corporal Ray testified that the total forensic mapping system was specialized, laser surveying equipment designed for crash and crime scene use. He admitted he did not plot the hillside or the wooded area, nor was he asked to do so. He also admitted that he did not follow the instructions in the training manual for the system that the user should make a field sketch.

On questioning by the court, Corporal Ray testified that Detective Lamance was the person who called him to the scene and who told him to begin the survey after he arrived. He said the evidence flags were present when he was at the scene. He said he did not attempt to determine if the footprints were distinguishable as being from different people. The parties stipulated that Detective Dillard was trained to use the total station mapping system.

On redirect examination, Corporal Ray clarified the location where the victim's body was found by identifying it in photographs. He acknowledged that the body had already been moved to a face-up position when he began mapping.

Detective Ike Cooper was recalled by the State and testified that despite incorrect labeling of the Defendant's possessions and clothing, a photograph exhibit accurately depicted items, including cash, that were collected from the victim. He identified $400 in cash, which the prosecutor counted in the jury's presence.

On cross-examination, Detective Cooper admitted that the evidence was poorly documented and preserved in this case. He identified a photograph of an evidence bag labeled "cellphone, medical examiner" and acknowledged that a pair of the Defendant's shoes and a belt were also inside the bag. He identified a property form, which listed the items he received from the medical examiner, and admitted the victim's cell phone was not listed. He stated that the evidence received from the medical examiner was originally in one bag but had been placed in new bags twice due to leakage and odor from blood on the items. He acknowledged, however, that the property form was created at the time he received the evidence. He admitted that the $400 taken from the victim's pocket had been in a marked evidence bag but that it was in the courtroom in an unmarked bag. He admitted that when inspected by the defense, the $400 was made up of one $100 bill and fifteen $20 bills but that in the courtroom, the $100 bill was no longer present and there were four additional $20 bills, one additional $10 bill, and two additional $5 bills. He claimed he counted the money after the defense viewed it and discovered a discrepancy, even though the bag and the property form both reflected the amount as $400. The parties stipulated that when the evidence was

reviewed by the prosecution and the defense on July 2, 2008, the currency identified as taken from the victim consisted of one $100 bill and fifteen $20 bills. Detective Cooper acknowledged that the bag containing $400 was not sealed when it was introduced as evidence. He also acknowledged that the coin found at the scene and the victim's gas card, lanyard, driver's license, phone card, and two lighters were not in the proper evidence bag.

Detective Cooper testified that he recalled the money recovered from the Defendant being counted when the prosecution and the defense met to review the evidence, but he said he did not recall the denominations of the money. He opened the bag identified as containing the Defendant's money and agreed that it contained nine $100 bills and ten $20 bills. He acknowledged that the property form said the bag contained $1,140.25 but that the change amounted to $0.45 when reviewed by the prosecution and the defense. He admitted that the evidence bag containing the $40 he added to the evidence stated that it was recovered on January 28, 2007, but that it was not recovered that day. He acknowledged that there were other labeling errors, including that items of evidence labeled "medical examiner" contained some of the Defendant's property and that a bag labeled "items from [the Defendant's] car" were actually recovered from the victim's apartment.

On redirect examination, Detective Cooper identified the Vice Lords as a street gang. He said that the gang's members were "numerous" and that they had a presence in Chattanooga.

On questioning by the court, Detective Cooper testified that based on the condition of the victim's phone card, it did not appear to have been used. He said he did not know whether the $400 of currency was found in the victim's pants or the victim's "hoodie." Upon the jury's request, items of clothing identified as belonging to the victim and found on the ground at the scene were shown to the jury.

On recross-examination, Detective Cooper testified that the clothing the Defendant was wearing when stopped by the police was not taken as evidence. He stated that a label on the bag in which the victim's $400 was originally kept noted that the money was found in the victim's pants, and he acknowledged that there was a photograph of the bag but that the bag no longer existed.

Hamilton County Medical Examiner Frank King testified as an expert in forensic pathology. He identified the autopsy report and the autopsy order generated by his office relative to the victim. He said the victim's cause of death was multiple gunshot wounds. He said that one of the gunshot wounds was the entry point an inch or two behind the left ear and that it went slightly forward and downward 1", exiting on the right front of the victim's face at the cheek. He said that he could not determine the position the victim was in when the

shot was fired but that the gun would have been at an angle that corresponded with the path of the bullet. He stated that the victim's skull fractured and that the brain bled as a result of this injury. He said the victim took "at least a couple of breaths" after this injury and drew blood into his lungs. He said there was another gunshot entry wound on the left side of the abdomen that went across, slightly back, and upward 1" before exiting the body. He said that this wound penetrated the abdominal wall, the stomach, the diaphragm, and the liver and that it fractured a rib. He said this gunshot caused bleeding and spillage of stomach contents into the abdominal cavity. He said he did not recover any bullets from the body.

Dr. King testified that a person could live for as long as a couple of hours after receiving an abdominal injury like the victim's but would eventually die of blood loss. He said that the gunshot wound to the head was a fatal wound and that it would cause immediate loss of consciousness and death within a few minutes. He said that in his opinion, the gunshot wound to the stomach happened before the gunshot wound to the head. He noted that the victim lived long enough for the stomach contents to spill and for the liver to bleed. He also noted that the victim aspirated a relatively small amount of blood after the head injury. He said the victim had abrasions on the buttocks and right forearm that occurred at or near the time of death. He identified photographs depicting holes in the victim's clothing and the victim's body. Referring to one of the photographs, he stated his opinion that based upon the absence of soot, powder, or burn injury on the entry wound to the victim's head, the shot was fired from at least two feet away. He said that the pattern of the exit wound on the victim's face indicated something was against the victim's face when the bullet left the body. He said the autopsy findings were consistent with the victim's face having been against the ground when the shot left the body. He identified a photograph of the victim's personal property, which he said consisted of currency, a driver's license, a discount card, a couple of cigarette lighters, and a lanyard. He said they also recovered a coin that was not in the photograph. He said that he did not remember and that there was no documentation of the pocket from which the money was recovered.

Dr. King testified that based upon his observations of a photograph of the victim's body taken at the scene, it was his opinion that the victim did not move after being shot in the head. He said the victim's blood tests revealed the presence of the drug MDMA, which was commonly called Ecstasy, and cannabinoids, related to marijuana and its metabolites.

On cross-examination, Dr. King testified that the blood patterns on the victim's body that he observed in the photograph from the scene were dried and that moving the victim's clothing to check for a pulse would not have changed the pattern. He said he would expect to see a hole in the hood of the victim's clothing if the hood had been over his head when the gunshot was fired. He said he did not examine the clothing in detail because he wanted to preserve it for further evaluation by the police. He acknowledged that although he observed

two holes in the victim's clothing, there appeared to be a third hole on the hood he had not noticed. He said this hole could be consistent with the path of the bullet that penetrated the victim's head. He said he thought it was unlikely that the victim's cell phone attached to the lanyard bounced up as the victim was running and was against the bullet as it exited the victim's head.

Dr. King acknowledged that law enforcement authorities gave him a general idea of the findings from the scene and what may have occurred before he received the body for an autopsy. He said that it was likely the bullet went into the ground after piercing the victim's head but that it was possible it hit the ground and ricocheted. He said that bullets were unstable after leaving the body and that they were sometimes found in places that could not be explained. He said that a victim might have an involuntary jerking reaction after a gunshot wound to the head or that the victim might go limp. He said that if the victim were holding a bag of leafy material, it might not be clutched in his hand after death.

Dr. King testified that MDMA was an amphetamine and that it would make a person feel good, although he said it was a dangerous drug that could cause increased body temperature, brain swelling, and hallucinations. He said it was possible that someone observing a person using MDMA might think the person was acting odd or paranoid.

On questioning by the court, Dr. King testified that the exact caliber of a bullet could not be determined by examination of bodily wounds. He said the victim had a recreational, non-fatal level of MDMA in his blood. He said that a person who received a gunshot to the abdomen like the victim's but who did not receive any additional gunshots could survive for minutes to a couple of hours if the person kept pressure on his or her liver. He restated his opinion that a person who received a gunshot wound to the head such as the victim's would not live long enough to spill gastric contents if the person received a second gunshot wound to the abdomen. He stated his opinion that the gunshots the victim received were inflicted within minutes of each other. He said he would expect damage to a cell phone that had contact with a bullet exiting a human body. He said there was no cell phone found on the victim's person when the autopsy was performed. He said the lack of blood from the victim's abdominal wounds was due to the composition of the victim's abdominal area. He did not think the victim's abrasions were a result of the police rolling the body over when they arrived.

On redirect examination, Dr. King testified that a cell phone against the head at the location where the bullet left the victim's head would not have any effect on blood drainage. On recross-examination, Dr. King acknowledged that stomach contents could continue to leak from the abdominal gunshot after the gunshot wound to the head. He also said blood could continue to drain into the abdominal cavity after the gunshot to the head. He said that

taking into account the possibility of this post-mortem leakage from the abdominal wounds, his estimation of the time between the first gunshot and the second might be shorter than his original estimate of several minutes.

The parties stipulated to the admissibility of the Tennessee Bureau of Investigation (TBI) laboratory's report reflecting that no latent fingerprints were found on the cartridge casing and pistol. The parties also stipulated to the admissibility of the TBI laboratory's report reflecting inconclusive results upon examination of the gunshot residue test sample collected from the Defendant.

The Defendant did not testify. His proof consisted of two exhibits that the parties stipulated were admissible. The first was a photograph of the Defendant's fresh head wound, reflecting that the photograph was taken on January 28, 2007, at 9:53:53. The second was a letter stating that the Defendant had been scheduled to begin training at Volunteer Training Center, Inc. on January 29, 2007.

The jury found the Defendant guilty of second degree murder as a lesser included offense of first degree premeditated murder. The jury acquitted the Defendant on counts charging first degree felony murder and especially aggravated robbery. The trial court sentenced the Defendant to serve thirty-five years as a Violent Offender. This appeal followed.

**I**

The Defendant contends that the evidence was not sufficient to support the second degree murder conviction and asks that this court modify his conviction to voluntary manslaughter. The State counters that the proof sufficiently supports the jury's verdict. We agree with the State that the record supports the second degree murder conviction.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

As relevant to the Defendant's case, second degree murder is an unlawful, knowing killing. T.C.A. §§ 39-13-201, 39-13-210(a)(1) (2010). A person acts knowingly with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result. Id. § 39-11-106(a)(20) (2006) (amended 2009).

In the light most favorable to the State, the Defendant admitted chasing and shooting the victim after meeting him to purchase drugs. Although the Defendant claimed to have believed the victim was going to rob him and said that the victim hit him in the head with a rock, the proof demonstrates that the victim fled from the Defendant down a steep hill after the Defendant brandished a handgun, that the chase continued even after both the victim and the Defendant fell down, that the Defendant was angry and was not going to "go away empty-handed," that the Defendant fired four shots at the victim, and that after the Defendant struck the victim in the abdomen, he shot the victim in the head while the victim was lying on the ground. The evidence is sufficient to support the jury's finding that the Defendant knew his conduct was reasonably certain to cause the victim's death.

In so holding, we have rejected the Defendant's claim that the proof establishes only that he was guilty of the lesser-included offense of voluntary manslaughter. "Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a) (2010). The Defendant argues that he was adequately provoked to kill the victim because he was angry and afraid when the victim hit him in the head with a rock and when he thought he was being "set up" when he saw Mr. McCurdy.

The jury was instructed on the offenses of first degree murder, second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide. These instructions included explanation of the required elements of each offense and of the distinction between second degree murder and voluntary manslaughter. By its second degree murder verdict, the jury rejected the Defendant's claim that he was in a state of passion that caused him to act irrationally and that there was adequate provocation to create a state of passion. The jury was not required to accredit the Defendant's statements about the factual events that preceded the crime, nor was it required to draw a conclusion that those facts established that the Defendant had been adequately provoked to act in a state of passion when he shot and killed the victim. See, e.g., State v. Williams, 38 S.W.3d 532, 538-39 (Tenn. 2001) (whether a knowing killing is committed in a state of passion produced by adequate provocation is a question for the jury); State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995). A rational jury could conclude from the evidence presented that the Defendant was not adequately provoked to act irrationally in chasing down and shooting the victim, resulting in the victim's death. The Defendant is not entitled to relief.

## II

The Defendant contends that the trial court erred by denying his motion to suppress four pretrial statements. He argues that his Miranda rights were violated when he was not advised of his rights before he made two of the statements and that the other two statements were not given voluntarily. The State contends that the trial court properly denied the motion to suppress with respect to all of the statements. We agree with the State.

The United States and Tennessee Constitutions protect a suspect from "being compelled to give evidence against himself." State v. Berry, 141 S.W.3d 549, 576 (Tenn. 2004) (citing U.S. Const. amend. V; Tenn. Const. art. I, § 9). If a suspect is in custody and under state-initiated interrogation, the police must first inform him of his Fifth Amendment rights in order for his confession to be admissible as substantive evidence in the trial of the matter. See Miranda v. Arizona, 384 U.S. 436 (1966). Once informed of those rights, a suspect may voluntarily waive them and speak with the police, or he may invoke his Miranda right against compulsory self-incrimination. Id. at 444; State v. Crump, 834 S.W.2d 265, 269 (Tenn. 1992). In order to introduce a defendant's confession into evidence at the trial of the matter, the burden rests upon the state to demonstrate a valid waiver by a preponderance of the evidence. See Colorado v. Connelly, 479 U.S. 157, 168 (1986).

"The test of voluntariness for confessions under article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996) (citing State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994)); see State v. Northern, 262 S.W.3d 741 (Tenn. 2008). For a confession to be considered voluntary, it must not be the product of "'any sort of threats or violence, . . . any direct or implied promises, however slight, nor by the exertion of any improper influence.'" State v. Smith, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)). The essential question, therefore, is "'whether the behavior of the State's law enforcement officials was such as to overbear [the Defendant's] will to resist and bring about confessions not freely self-determined . . . .'" State v. Kelly, 603 S.W.2d 726, 728 (1980) (quoting Rogers v. Richmond, 365 U.S. 534, 544 (1961)). The Supreme Court has held that in order for a confession to be involuntary, it must be the product of coercive state action. See, e.g., Connelly, 479 U.S. at 163-64.

In Miranda, the Court limited its holding to situations involving "custodial interrogation," which it defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444. Miranda interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those

-22-

normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980) (footnote omitted). However, "questioning initiated by the accused is not interrogation in the Innis sense." State v. Land, 34 S.W.3d 516, 524 (Tenn. Crim. App. 2000) (citing Edwards v. Arizona, 451 U.S. 477, 484 (1981)).

On review, an appellate court may consider the evidence presented at the suppression hearing as well as at trial in determining whether the trial court properly denied a pretrial motion to suppress. State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998). A trial court's factual findings in a motion to suppress hearing are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001). The application of the law to the facts as determined by the trial court is a question of law which is reviewed de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

**January 28, 2007 Recording in Officer Chastain's Patrol Car**

The Defendant's first challenge is to his statements recorded without his knowledge when he was detained in Officer Chastain's patrol car at the scene. He argues that Officer Chastain asked questions designed to elicit incriminating information without advising him of his Miranda rights and that the proper remedy was for the trial court to suppress the evidence of the entire conversation, rather than only the portion in which Officer Chastain asked if clothing at the scene was the Defendant's.

At the suppression hearing, Officer Chastain testified that while the Defendant was detained in his car at the scene, he placed an activated digital recorder that he used "for traffic stops and whatnot" on the back deck of the passenger compartment of his car. He said he "pretty much kept the conversations to weather-related, tires, wheels" and did not physically assault or threaten the Defendant into making any statements. He acknowledged that the Defendant was handcuffed and that the Defendant's shoes were taken at some point.

At the suppression hearing, Officer Chastain testified that when he first encountered the Defendant, he noticed that the Defendant's forehead was bleeding. He said that he mentioned this to the Defendant during the secondary patdown and that the Defendant seemed unaware of it. He said his duties included the responsibility to determine whether

a person in his custody or control needed medical care because of a life-threatening illness or injury.

In his trial testimony, Officer Chastain testified about details involving his conversation with the Defendant. Officer Chastain denied that he conducted any formal interrogation of the Defendant not reflected in the recording. He considered the Defendant a suspect when he handcuffed him and put him in the back of the police car. He said he asked the Defendant for general information, such as the Defendant's name and birth date, but did not ask any questions about where the Defendant had been or what he had been doing that morning. He said that he stayed outside the car for ten or fifteen minutes until another officer arrived and that he walked around a subdivision sign and saw a pile of clothing. He said that after another officer arrived at the scene, he took the Defendant out of the car to conduct a secondary patdown because he "highly suspect[ed]" the Defendant was involved in the shooting that occurred down the hill and that he wanted to be sure he recovered any weapons. He said he thought this was the point at which he activated the recorder and put it in the back of the car. After he was sitting in the car with the Defendant, he asked the Defendant if the clothing was his. He said he went to the clothing, which was about twenty-five feet away and checked to see if there was a firearm with it. He said that he tried to stay outside the car as much as he could but that he was in the car for part of the time. He said the Defendant mumbled to himself frequently. He acknowledged that he told the Defendant he could not tell him what was going on.

The Defendant testified that when he was detained in Officer Chastain's car, he was not told why he was being held or whether he was being charged. He said he asked for water but none was provided. He said he was unaware of the recorder. He said he wore a t-shirt with cut-off sleeves, pants, and socks. He said someone took his shoes from him. He said his head hurt from his injury and estimated that his head was injured about an hour before he was detained in the car. The Defendant acknowledged that he had been arrested once and that he served a prison sentence for aggravated robbery. He did not recall whether he was advised of his Miranda rights during the previous arrest.

The recording was played for the court. This court has reviewed the recording. It is difficult to understand at times, and the description that follows is based upon this court's review of the recording, rather than upon the transcript submitted as an exhibit. See, e.g., State v. Barnard, 899 S.W.2d 617, 623-34 (Tenn. Crim. App. 1994) ("[A] transcript of a tape may be given to a jury where the jury is instructed that the tape, and not the transcript is the actual evidence."). The recording consists mostly of lengthy periods in which there is no conversation. Officer Chastain talks to other officers and on the radio. The sound of a car door closing is heard several times. The Defendant initiates conversation, stating that the title to his car is at his house and asking whether the officer will take him to get gas for his

-24-

car. Approximately twenty-two minutes into the recording, Officer Chastain asks the Defendant, "Is that your coat and stuff over there?" to which the Defendant responds, "I just took it off" and "I was sitting over there." Officer Chastain does not ask anything further about the clothing. Approximately eight minutes later, after an officer requests the Defendant's driver's license and there is radio conversation between officers about their respective geographic locations, the following is said:

> CHASTAIN: Where's your head hurt at?
>
> DEFENDANT: Hmm?
>
> CHASTAIN: Where is your head --
>
> DEFENDANT: On the left side. He said I had a cut. I hit it on that wall up there.
>
> CHASTAIN: That wall up there?
>
> DEFENDANT: Yeah, because I was sitting down, fixing to sit down, got through walking from down there, trying to just to get up with my wife and children, and I thought my home girl gone to bring some gas.

Approximately two minutes of near-silence follows, with the only sounds being murmurs that appear to come from conversations outside the car. There is brief conversation in which the Defendant asks for information about what is transpiring and Officer Chastain declines to answer. The Defendant asks if someone is the person whom Officer Chastain could ask about loosening his handcuffs. For approximately two minutes, the only sounds come from voices on the police radio and a slamming car door. The following dialogue then occurs:

> DEFENDANT: That s— don't even hurt, though.
>
> CHASTAIN: That hurting?
>
> DEFENDANT: Nah, I said, I really, I bought it, but I ain't telling you it didn't hurt, though. I ain't -- I just hit it right there on the wall trying to sit down, but I ain't feel I hit it that hard. [unintelligible mumbling] I got blood on your seat back here from laying my head down. I just feel thirsty, real bad. I ain't

-25-

ate or nothing. [coughing] Excuse me. You have anything I can drink?

Approximately six minutes elapse, during which the Defendant intermittently requests food and something to drink.

The trial court found that the Defendant was in custody when the recording was made but that the only part of the conversation that was interrogation and required Miranda warnings was the part about ownership of the clothing. The court suppressed this portion of the evidence. As noted above, however, Officer Chastain testified without objection on direct examination at the trial that he asked the Defendant if the clothing was his.

The Defendant argues that the trial court should have suppressed the entire statement because Officer Chastain's placing the recorder in the back of the car was designed to elicit incriminating evidence through casual conversation. The Defendant notes that because the evidence was admitted, the jury heard evidence that he gave conflicting statements in his statement that he hit his head on a wall and his later report that the victim hit him in the head with a rock.

We begin by noting our agreement with the trial court's determination that the Defendant was in custody. See Miranda, 384 U.S. 444. In determining whether an officer's custodial questioning is designed to elicit an incriminating response, our supreme court has said:

> The definition of interrogation focuses primarily upon the accused's perception rather than on the police officer's intent. . . . However, the officer's intent may be relevant to determine whether the officer should have known his or her words or actions were reasonably likely to invoke an incriminating response.

State v. Sawyer, 156 S.W.3d 531, 534 (Tenn. 2005) (citing Innis, 446 U.S. at 301 n. 7); see State v. Perry Avram March, No. M2007-00053-CCA-R3-CD, Davidson County (Tenn. Crim. App. Jan. 27, 2011), pet. for reh'g denied (Feb. 23, 2011).

The Defendant's proof at the suppression hearing focused on his allegations that he was deprived of food, water, restroom facilities, and warmth after he was detained. He did not testify about how he perceived Officer Chastain's questions and statements. We note from our review of the recording that in the intermittent periods in which voices can be heard, the Defendant mumbled to himself, initiated conversation, and provided information

in excess of that requested by Officer Chastain. See Land, 34 S.W.3d at 524 ("There is no constitutional protection from statements volunteered by the accused."). We acknowledge that the Defendant was handcuffed and locked in the back of a police car, but the record contains no indication the Defendant believed he was being questioned about a crime during his intermittent conversation with Officer Chastain. Although the officer did not testify about his intent, the record supports a conclusion that he was not attempting to induce the Defendant into making incriminatory statements. Officer Chastain testified that he stayed outside the car as much as possible. In the recording, there are sounds of a car door opening or closing and distant sounds of conversations outside a closed car that support his testimony. Despite the trial court's ruling, Officer Chastain testified without objection that he asked the Defendant about the clothing, although he did not testify about the Defendant's response. We conclude that when Officer Chastain asked where the Defendant's head was injured and whether the injury hurt, the Defendant provided unsolicited information explaining how he received the injury.

Officer Chastain also testified that he went to the scene based upon a report that two men were shooting at each other. He said that he was concerned about there being a weapon because he suspected the Defendant's involvement and that he inspected the clothing to ensure there was no weapon and performed two patdowns of the Defendant for weapons. An officer may ask questions that are necessary to ensure the officer's safety or that of the public without violating the Miranda rights of a person in custody. New York v. Quarles, 467 U.S. 649, 657 (1984) (suspect who was handcuffed and surrounded by four officers at scene was in custody for purposes of Miranda, but "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination"); see State v. Ricky Ronald Crawford, No. E2005-02018-CCA-R3-CD, Sullivan County, slip op. at 8 (Tenn. Crim. App. Feb. 1, 2007), app. denied (Tenn. May 21, 2007).

The record supports a conclusion that Officer Chastain's questions and actions were not "reasonably likely to elicit an incriminating response." See Innis, 446 U.S. at 301. We hold that the trial court did not abuse its discretion in allowing evidence of the Defendant's conversation with Officer Chastain. The Defendant is not entitled to relief.

**January 28, 2007 Statement at the Red Bank Police Station**

Next, the Defendant argues that the trial court should have suppressed the statement he gave to Chief Sneed and Detective Lamance at the police station on January 28, 2007. He argues that he did not knowingly and voluntarily waive his Miranda rights because he was hungry and thirsty. The State argues that the record supports the trial court's findings that the Defendant knowingly and voluntarily waived his rights. We agree with the State.

The record reflects that the Defendant was detained at the scene shortly after 11:00 a.m. and was held at the scene for three to four hours. The Defendant was handcuffed in the police car, and his shoes were removed. He was taken to the police station, where he was detained for a few more hours, where he spent part of the time with one of his hands handcuffed to a bench and later was held inside a holding cell. Although the officers' testimony did not establish the length of time the Defendant was handcuffed to the bench, the Defendant testified that it "[h]ad to be a couple hours." The Defendant testified at the hearing that while he was handcuffed to the bench, he asked for something to drink but did not receive anything and that he asked to use the restroom but was told he would have to urinate on himself. He said he was in the holding cell "another couple hours." Officer Chastain said the holding cell had a toilet and a spigot that could be used either as a water fountain or as a regular faucet. The Defendant stated that he did not try to drink water in the holding cell because he was tired and cold but admitted that he knew how to use the spigot to get a drink. The Defendant said that he could see a window as he was brought out of the holding cell to Chief Sneed's office and said it that appeared the time was near sunset.

Chief Sneed said he arrived at the police station around 8:00 p.m. and had the Defendant brought to his office. The Defendant signed his name in two places on a waiver of his <u>Miranda</u> rights at 8:14 and 8:15 p.m. The Defendant testified that he was offered pepperoni pizza after he was brought into the office but said he did not eat pork. The Defendant acknowledged that he was given a soft drink after this first interview and that he drank a cup of water on the way from Chief Sneed's office to Detective Cooper's office. In Detective Cooper's office, he gave a second statement. He said he was given another soft drink. The video of the statement depicts the Defendant in a flannel shirt, which he acknowledged he was given to wear. The recording of this statement demonstrates that the Defendant was offered food again but refused because it contained pork. The Defendant complained during the statement that he was hungry, thirsty, and cold. He was given a soft drink and a steak biscuit after the statement ended at 11:42 p.m.

The trial court noted that the video recording of the statement showed that the Defendant appeared coherent and that he was wearing a long-sleeved shirt and socks. The court also noted that the Defendant was offered food, which he refused. The court found that the Defendant's statement was given knowingly and voluntarily.

Upon review, we hold that the evidence does not preponderate against the trial court's findings. See <u>Odom</u>, 928 S.W.2d at 23. The trial court discredited the Defendant's testimony about his physical condition in favor of the contrary evidence. We hold that the trial court properly denied the motion to suppress this statement. The Defendant is not entitled to relief.

**January 28, 2007 Statement to Detective Cooper**

The Defendant's third attack to the trial court's suppression rulings is to the statement he gave to Detective Cooper. This statement was the second statement the Defendant gave after he was taken to the police station on January 28. The Defendant argues that in addition to his earlier allegations of coercion surrounding the statement to Chief Sneed and Detective Lamance, the statement to Detective Cooper was coerced because Detective Cooper promised that he would release Sasha House and that he would obtain a twenty-five-year sentence for the Defendant if the Defendant would make a statement. The State argues that the trial court properly denied the motion to suppress this statement. We agree with the State.

The Defendant testified at the suppression hearing that Detective Cooper stated that the Defendant did not want his child to be born in jail and that unless he made a statement, Ms. House would be charged with the crime. The Defendant claimed Detective Cooper promised to release Ms. House if the Defendant made a statement. He testified that the detective claimed to be a friend of the district attorney and that he would guarantee him a twenty-five-year sentence, rather than a life sentence.

Detective Cooper testified that he never promised the Defendant a twenty-five-year sentence. He said that the Defendant never asked for food but that he would have provided it had the Defendant requested. He said that aside from when he was escorting the Defendant across the hall for the statement, he did not talk to the Defendant before turning on the video recorder. He said Ms. House's mother caused a commotion in the hallway.

The recording of the statement does not contain any promises by Detective Cooper regarding Ms. House or about the sentence the Defendant would receive. Rather, the Defendant makes statements that exculpate Ms. House from any involvement and requests that she be allowed to leave. A woman leaves the room near the beginning of the recording. Near the end of the statement, Detective Cooper leaves the room, and Detective Lamance enters. The Defendant requests food and water but refuses food that Detective Lamance brings to him because it contains pork. Detective Lamance then allows the Defendant to drink water using the detective's cup and gives him steak and rolls that the detective's wife packed.

The trial court found that the statement was not coerced. The court discredited the Defendant's testimony in favor of that given at the suppression hearing by the officers. The court found that the Defendant's testimony was inconsistent and contained "over-statements" when compared with the Defendant's demeanor and statements on the video recording. The court found that Detective Cooper did not make any promises to the Defendant.

After review of the evidence at the suppression hearing and the trial, we hold that the evidence does not preponderate against the trial court's findings. See Odom, 928 S.W.2d at 23. The trial court found the Defendant's testimony incredible. The video recording reflects that the Defendant urged for Ms. House to be released and supports the trial court's conclusion that Detective Cooper did not make any promises to the Defendant. The trial court properly denied the motion to suppress this statement. The Defendant is not entitled to relief.

**January 29, 2007 Statement to Officer Spandau**

The Defendant also argues that the trial court should have suppressed the statements he made to Officer Spandau when he was taken to the scene on January 29 because the Defendant denied making the statements, there was no written waiver of the Defendant's Miranda rights, and the officer failed to make notes about the Defendant's statements. The State argues that the trial court properly denied the motion to suppress. We agree with the State.

The Defendant testified that he agreed to return to the scene to help locate the gun. Chief Sneed drove him to the park, and after he pointed to the area where the gun was, he was held in Officer Spandau's patrol car. He said that he and Officer Spandau discussed the weather and sports and that the officer gave him food and drink. He said that he only provided information about the gun and that he did not recall Officer Spandau questioning him about the events surrounding the crime. He denied telling Officer Spandau that he was a gang member or that he met the victim once before January 28.

Officer Spandau testified that he and the Defendant discussed sports, the Defendant's childhood, and the Defendant's former gang membership, and that the Defendant began volunteering information about the crime. He said he advised the Defendant that the Defendant did not have to talk to him. He said that he reminded the Defendant of his Miranda rights but that the Defendant said he knew his rights and that he would state what happened.

The trial court found that Officer Spandau did not interrogate the Defendant and that the Defendant volunteered statements after being reminded of his Miranda rights. On appeal, the Defendant asks us to reweigh the trial court's credibility determination in his favor. However, this court is not at liberty to reevaluate matters of witness credibility unless the evidence preponderates against the trial court's findings. See Odom, 928 S.W.2d at 23. In the present case, the evidence supports the trial court's credibility determinations. The trial court did not err in denying the motion to suppress the statement to Officer Spandau.

**III**

The Defendant argues that the State violated his due process rights by failing to provide updated discovery material consisting of Officer Spandau's personnel records pertaining to his resignation from the Red Bank Police Department. He argues that the information was relevant evidence that could have been used to impeach Officer Spandau's credibility. The State counters that the Defendant has not established a violation of Brady v. Maryland, 373 U.S. 83 (1963). We agree with the State.

In Brady, the United States Supreme Court held that the prosecution has a constitutional duty to furnish an accused with exculpatory evidence pertaining to either the accused's guilt or innocence or the punishment that may be imposed. Id. at 87. Failure to reveal exculpatory evidence violates due process when the evidence is material either to guilt or punishment, irrespective of the prosecution's good faith. Id.

The "prosecution is not required to disclose information that the accused already possesses or is able to obtain." State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992). Although the State is not obligated to disclose the entirety of the investigatory police work in a case, the State is required to disclose all favorable evidence obtained by any person acting on the government's behalf. See Moore v. Illinois, 408 U.S. 786, 795 (1972). Evidence that is "favorable to the accused" includes evidence that is deemed to be exculpatory in nature and evidence that could be used to impeach the State's witnesses. State v. Walker, 910 S.W.2d 381, 389 (Tenn. 1995); State v. Copeland, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998); see also United States v. Bagley, 473 U.S. 667, 676 (1985).

The Tennessee Supreme Court has held that in order to establish a Brady violation, four elements must be shown by the defendant:

> (1) that the defendant requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
>
> (2) that the State suppressed the information;
>
> (3) that the information was favorable to the accused; and
>
> (4) that the information was material.

State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995); see also Walker, 910 S.W.2d at 389. The Defendant must prove a Brady violation by a preponderance of the evidence. Edgin, 902 S.W.2d at 389.

The record reveals the following information: The defense filed a general discovery motion on June 16, 2008. A defense subpoena duces tecum for Officer Spandau's "personnel, disciplinary, write ups, and employment records" was served on the Red Bank Police Department on July 3, 2008. The State moved the trial court to quash the subpoena. At the hearing on the motion to quash, the trial court ordered that the files be submitted for in camera review to determine if there was any information relevant to the Defendant's case. The court instructed the prosecutor not to review the files before producing them to the court and stated its preference that the files be produced to the court by the agency involved, not by the district attorney. The court reviewed the files and provided them to the defense. The defense issued a second subpoena duces tecum for "All Internal Affairs Records . . . concerning former officer David Spandau," which was served on August 27, 2008. The Defendant's trial took place on September 9 through September 20, 2008. At the trial, Mr. Spandau testified that he had recently resigned from the police force for personal reasons. In a jury-out hearing, defense counsel informed the court she was unaware that Mr. Spandau was no longer a Red Bank Police officer and that this information was not in the personnel records she received. The court instructed the parties to confer off the record, and after that conference, defense counsel stated on the record that the defense was convinced that the resignation and its circumstances were not relevant to the Defendant's case.

After the trial, defense counsel obtained additional personnel documents for Mr. Spandau from the City of Red Bank's legal counsel. A letter from Chief Sneed to the city manager stated that Chief Sneed met with Officer Spandau on August 14, 2008, and informed him that he was the subject of an internal affairs investigation and would be suspended without pay until the investigation was completed. The letter also stated that Officer Spandau became "hostile," resigned, demanded his paycheck, and swore at Chief Sneed. A letter to Officer Spandau from the city manager, also dated August 14, 2008, stated, "Chief Sneed has informed me that an investigation will take place dealing with various issues including insubordination, lying, and the possibility of interfering with an ongoing criminal investigation in a case which could possibly compromise the investigative integrity of our Police Department."

Turning to the Brady analysis, we note that the Defendant requested the relevant information from Mr. Spandau's personnel file. Not only did the Defendant file a discovery request, he issued two subpoenas for the documents. The Defendant's right to receive the documents was litigated as well.

The record reflects that defense counsel was not informed before the trial that Mr. Spandau was no longer employed by the Red Bank Police Department. The relevant documents and information were requested and should have been disclosed to the defense. The fact that the Red Bank Police Department, not the district attorney, did not provide the information is irrelevant. See Johnson v. State, 38 S.W.3d 52, 56 (Tenn. 2001) (citing Strickler v. Greene, 527 U.S. 263, 275 n.12 (1999)).

The documents provide information that could have been used at trial to challenge Mr. Spandau's credibility. Our supreme court has said:

> "The Brady obligation comprehends evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness." Commonwealth v. Ellison, 376 Mass. 1, 379 N.E.2d 560, 571 (1978); see also Mazzan v. Warden, Ely State Prison, 993 P.2d 25, 37 (Nev. 2000) (stating that evidence is favorable under Brady if "it provides grounds for the defense to attack the reliability, thoroughness, and good faith of the police investigation, to impeach the credibility of the state's witnesses, or to bolster the defense case against prosecutorial attacks").

Johnson v. State, 38 S.W.2d 52, 56-57 (Tenn. 2001). We conclude that the information was favorable to the Defendant.

The question remains whether the evidence was material. For evaluating whether there is a due process violation under Brady, evidence is considered material and its nondisclosure a violation of due process "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Edgin, 902 S.W.2d at 390 (opinion on petition for rehearing) (quoting Kyles, 514 U.S. at 433). The question is not whether the Defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. Kyles, 514 U.S. at 434.

The Defendant argues that cross-examination of Mr. Spandau from the unproduced documents was essential. He notes, "Officer Spandau . . . testified that the [Defendant] had made an unrecorded statement in the police car on [the day after the crime], in which [the

Defendant] was alleged to have made statements including that he 'walked up' and shot the victim in the head after the victim fell from being shot the first time."

As we have said, the evidence was requested, suppressed, and favorable to the Defendant. We conclude, however, that despite the State's failure to disclose this information, it was not material as contemplated in <u>Brady</u>. We note that evidence favorable to the defense and subject to disclosure nevertheless may not be "material" under <u>Brady</u>'s standard for materiality in determining whether the Defendant received a fair trial that comports with due process. <u>See, e.g.</u>, <u>Copeland</u>, 983 S.W.2d at 706 (holding that the State's failure to disclose that one of its witnesses had been convicted of writing a worthless check and had been charged with writing several other worthless checks was favorable evidence that the defendant could have used to impeach the witness at the trial but was not material under <u>Brady</u>'s parameters for establishing a due process violation); <u>Michael Eugene Sample v. State</u>, No. W2008-02466-CCA-R3-PD, Shelby County (Tenn. Crim. App. June 15, 2010) (holding in death penalty defendant's post-conviction appeal that evidence of witness's failure to identify the defendant in a lineup could have been used to impeach the witness's trial testimony identifying the defendant as the person who shot at him but was not material as contemplated by <u>Brady</u> because the defendant failed to establish a reasonable probability that the results would have been different if this information had been disclosed before the trial; also holding evidence not material under <u>Brady</u> when an eyewitness's pretrial description to a police officer of the suspects could have been used to impeach the eyewitness's trial testimony identifying the defendant and the co-defendant as the perpetrators of the crime), <u>app. denied</u> (Tenn. Nov. 12, 2010); <u>State v. Terrell Thomas</u>, No. E2003-02658-CCA-R3-CD, Cocke County (Tenn. Crim. App. Nov. 4, 2004) (holding that evidence not disclosed until after the trial that could have been used to impeach a prosecution witness was not material where "it [was] cumulative impeachment evidence and relatively insignificant in comparison to the evidence that was presented to the jury at trial"), <u>app. denied</u> (Tenn. Feb. 28, 2005).

Turning to the present case, the statement Mr. Spandau attributed to the Defendant was relevant to the question of whether the Defendant premeditated the killing. We note that although the Defendant was charged with premeditated first degree murder and especially aggravated robbery, the jury acquitted him on those charges and found him guilty of second degree murder, which does not require premeditation. <u>Compare</u> T.C.A. § 39-13-202(a)(1) (2006) (amended 2007) (premeditated first degree murder) <u>with</u> § 39-13-210 (2010) (second degree murder). Even if the defense had the information to thoroughly impeach Mr. Spandau's credibility, other evidence overwhelmingly established the Defendant's culpability.

The Defendant admitted in his recorded statement that he chased down the victim and shot him multiple times. Dr. King's testimony established that the findings of the autopsy and a photograph taken at the scene were consistent with the victim's having been shot in the abdomen and then having been shot a second time in the head after he fell from the first shot. Mr. McCurdy testified that he saw the Defendant chasing the victim for several minutes, that he heard three or four gunshots, and that he saw the Defendant holding a handgun. The record also reflects that the defense thoroughly challenged Mr. Spandau's credibility through cross-examination about the creation of his written report. We hold that although the evidence should have been disclosed before the trial, it was not material under the Brady standard for establishing a due process violation because its suppression does not undermine confidence in the verdict. The Defendant is not entitled to relief.

**IV**

The Defendant contends that the trial court erred in granting the State's motion to allow the jury to view the scene. The State responds that the trial court did not abuse its discretion. We agree with the State.

It is within the trial court's discretion to allow the jury to view a crime scene. We review a trial court's ruling in allowing or denying a jury view for abuse of discretion. Boyd v. State, 475 S.W.2d 213, 707-708 (Tenn. Crim. App. 1971); State v. Dwight Miller, No. 02C01-9708-CC-00300, Haywood County, slip op. at 16 (Tenn. Crim. App. Dec. 29, 1998); cf. State v. Cauthern, 967 S.W.2d 726, 743 (Tenn. 1998) (applying abuse of discretion standard in reviewing trial court's ruling that jury could be shown a video recording of the crime scene).

In the present case, the State made a pretrial motion for the jury to view the scene during the trial. The State noted that it could not demonstrate the topographical slope of the scene through a video recording and that photographs did not demonstrate the expanse of the scene, the sight lines, and the distance of the chase. The State argued that the distance involved in the chase and the slope of the hill were relevant to show the effort the Defendant would have undertaken to kill the victim, which the State contended was relevant to the element of premeditation for the first degree murder charge. The defense objected on the basis that the scene had changed since the crime. The defense noted in the trial court that the vegetation and undergrowth would appear very different to a jury viewing them in the summertime during trial than they appeared in wintertime when the crime occurred. The defense claimed that the view of the scene created an erroneous impression that the chase down the hill would have been much more difficult than it was on the day of the crime. The defense argued that the appearance of the scene could be adequately demonstrated through photographs. The trial court allowed the jury view, and there was proof at the trial that the

vegetation had been different at the time of the crime than it appeared when the jury viewed the scene. Photographs of the scene taken near the time of the crime were admitted as exhibits.

We acknowledge the Defendant's reliance on this court's statement in Dwight Miller that "it is a rare occasion on which a jury view will be allowed." Slip op. at 17 (citing State v. Barger, 874 S.W.2d 653, 655 (Tenn. Crim. App. 1994)). As noted above, however, the trial court's ruling will not be reversed absent an abuse of discretion. In the present case, the State demonstrated the relevance of having the jury view the scene to the element of premeditation, which the State had the burden of proving beyond a reasonable doubt on the count charging first degree murder. We hold that the trial court did not abuse its discretion in allowing the jury view. The Defendant is not entitled to relief.

**V**

The Defendant contends that the trial court erred in admitting evidence that he was affiliated with the Vice Lords gang. The State contends that the trial court properly denied the Defendant's motion in limine to exclude this portion of the Defendant's statement because it was probative of his credibility. We hold that the evidence should not have been admitted, but the error was harmless.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Prejudicial evidence is not excluded as a matter of law. State v. Carruthers, 35 S.W.3d 516, 577 (Tenn. 2000) (citing State v. Gentry, 881 S.W.2d 1, 6 (Tenn. Crim. App. 1993)). The term "undue prejudice" has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Comm'n Notes). The trial court's decision to admit or exclude evidence will be overturned on appeal only when there is an abuse of discretion. See State v. Samuel, 243 S.W.3d 592, 599 (Tenn. Crim. App. 2007).

In the present case, the Defendant was asked during his video recorded statements with whom he associated. He responded that other than his wife, he did not have family in the area and that he associated with the Vice Lords, although he could identify them only by nicknames. Typically, when the question of admissibility of evidence of a defendant's gang affiliation has been considered, the issue has been whether it was admissible as substantive

evidence of character under the limits of Tennessee Rule of Evidence 404. See, e.g., State v. Berry, 141 S.W.3d 549, 582 (Tenn. 2004) (Appendix); State v. Orlando Crayton, No. W2000-00213-CCA-R3-CD, Gibson County (Tenn. Crim. App. June 27, 2001). In contrast, the trial court in the present case specifically rejected admission of the evidence as proof of conduct conforming with a character trait "because it's speculative and it goes towards propensity." See Tenn. R. Evid. 404.

Instead, the court admitted the evidence as probative of (1) the Defendant's credibility in his pretrial statement and (2) the circumstances in which the statement was given. The trial court did not explain, nor does the State argue, the basis upon which the Defendant's statement about associating with local Vice Lords was probative of the Defendant's credibility in his pretrial statement or had any bearing on the circumstances in which the statement was taken. We note, as well, that the Defendant did not testify. Thus, his credibility was not subject to impeachment under Rules 608 or 609. See Tenn. R. Evid. 608 (impeachment of a witness with evidence of character and conduct of the witness), 609 (impeachment of a witness with evidence of conviction of a crime). We hold that the trial court erred in admitting the evidence for impeachment of the Defendant's character.

The Defendant is not entitled to relief, however, unless he can demonstrate that the error more probably than not affected the judgment. T.R.A.P. 36(b). We hold that he has not. The proof of gang membership was brief. There was no proof that the Defendant's killing the victim was motivated by gang rivalry or otherwise. Whether the Defendant was a Vice Lord had no bearing on the issue of premeditation, nor did it have any bearing on the Defendant's self-defense and voluntary manslaughter theories. Any error was harmless. The Defendant is not entitled to relief.

**VI**

The Defendant contends that the trial court erred in imposing a Range II sentence of thirty-five years. He argues that the enhancement factors upon which the trial court relied were not sufficient to support a sentence that was near the maximum for Range II and that the court placed too much weight on his prior convictions. The State contends that the trial court properly sentenced the Defendant. We agree with the State.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40-35-401(d) and -402(d) (2010). As the Sentencing Commission Comments to these sections note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and

principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "'the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991)). In this respect, for the purpose of meaningful appellate review, the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994); see T.C.A. § 40-35-210(e) (2010).

Also, in conducting a de novo review, we must consider (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210 (2010); see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986).

In imposing a sentence within the appropriate range of punishment for the defendant:

> [T]he court shall consider, but is not bound by, the following advisory sentencing guidelines:
>
> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210. From this, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Carter, 254 S.W.3d at 343 (quoting T.C.A. § 40-35-210(d)).

At the Defendant's sentencing hearing, the parties stipulated that the Defendant was a Range II offender. The presentence report was received as evidence and reflected that the twenty-eight-year-old Defendant had four prior aggravated robbery convictions, three of which were committed on the same date. All four offenses were committed when the Defendant was eighteen years old. The Defendant served an effective eight-year sentence for the offenses and was released after serving his sentence approximately one year before he killed the victim. While incarcerated, the Defendant had sixteen disciplinary infractions, including assault, a positive drug screen, creating a disturbance, and participating in gang activities. The Defendant obtained his G.E.D. while in prison. The Defendant worked after he was released from prison until December 2006, when he was fired for cashing another person's paycheck. The Defendant was married and had two minor children from other relationships. The Defendant admitted he began using marijuana at age fourteen and had used it the day before he committed the present offense.

Jim Rox testified that he prepared the presentence report. He identified certified copies of two judgments for the Defendant's prior offenses. The judgments are unusual in that the trial court entered two judgments of conviction on each form, rather than entering a separate judgment for each count. The judgments reflect that the Defendant entered "best interest" guilty pleas. He said that the Defendant admitted joining the Vice Lords when he was thirteen and living in Chicago but that the Defendant claimed he had not been active in the gang after moving to Tennessee because "there wasn't much of a presence here." Mr. Rox acknowledged on cross-examination that he did not contact the county jail to inquire about the Defendant's conduct since the arrest for this case and that he did not contact the Defendant's family members for input. He acknowledged that he failed to list that the Defendant had two step-children.

Raymond Lattimore, the victim's grandfather, testified that he helped raise the victim. He said the victim's family was "torn apart" by the victim's death. He said that after the victim's death, he saw a therapist, took medication, and was told he was suicidal. He said that Ms. House lied at the trial about not knowing the victim and that his grandson was dead because of Ms. House.

Vicky McGoy testified that she was the victim's aunt. She read a letter she wrote addressing the impact of the victim's death on his family.

Tracy Wade, the victim's mother, testified that the victim had two young children. She said that the older child asked her daily when they could move to be with his father and that the younger child was only two weeks old when the victim was killed. She said that the victim was her only son and that they had been best friends. She said that the Defendant apologized to her in court but that she did not believe he was sorry because he did not tell the truth at the trial. She said she took a job near the victim's grave in order to be closer to him and to visit him daily.

The trial court stated that it would not consider the in-court statements of the victim impact witnesses as evidence because Code section 40-38-207 provided for consideration of victim impact statements that were submitted to the person preparing the presentence report. The court said, however, that it did not want to deprive the victim's family members of the opportunity to give those statements in court.

David Coffman testified for the Defendant that he was the volunteer choir director for the Hamilton County Jail and was a spiritual counselor for some of the inmates. He said that he had known the Defendant for about nine months and that the Defendant always asked for prayers for the victim, the victim's family, the inmates, the inmates' families, judges, officers, and lawyers. He said the Defendant, who previously followed the Islamic faith, attended weekly church services and was "a very humble Christian." He said the Defendant witnessed about his faith to other inmates.

Hamilton County Jail chaplain Bill Smith testified that he had known the Defendant for about two years. He said the Defendant's thinking changed after the Defendant attended a religious retreat. He said that the Defendant was respectful to the jailers and that he talked to inmates about renouncing their gang affiliations. He said the Defendant was a spiritual leader in the jail and influenced other inmates to attend church services. He said he baptized the Defendant on November 14, 2007. He said the Defendant was unlike many inmates because the Defendant appeared to be genuinely sorry for his crime. He said that he and the Defendant discussed the crime several times and that the Defendant cried about how it affected the victim's family. He said the Defendant often prayed for the victim's family. He said that he was unaware of any disciplinary action during the Defendant's confinement in the jail and that the Defendant had stopped incidents involving other inmates from happening. He said the Defendant led the nightly prayer for a group of sixteen high security inmates. He said the Defendant completed faith-based programs in jail. On cross-examination, he acknowledged that the Defendant mentioned that robbery was involved in the victim's homicide. He said, however, that his memory was vague and that the Defendant may have said that he was robbed.

Don Dillman testified that he was a missionary in prison ministry and that he met the Defendant when volunteering at the county jail. He said the Defendant gave testimony about his faith to a group of inmates. He said he would be comfortable with his wife being around the Defendant or with leaving money around the Defendant.

The Defendant exercised his right of allocution and read a letter he wrote. In it, he apologized to God, his family, the victim's family, and the McCurdy family for his crime and its consequences. He accepted responsibility for his "reckless behavior." He said the victim was not his enemy and he never wished for anyone to die. He said that in the victim's memory, he would try to help as many people as possible find Christ.

The defense submitted a sentencing memorandum that the trial court received as an exhibit. The sentencing memorandum states that the Defendant was from an impoverished background. After his mother developed cancer and had a colonostomy, he was sent to live with his great aunt in Chicago for eighth grade. He did well in school but lived in an inner city area that had many gangs. He was later sent to live with an aunt in a safer community, but his cousins were gang members. In his new school, individuals who did not choose a gang were beaten and terrorized by members of all gangs. He joined the Vice Lords at age thirteen and was "beaten in" to the gang by five members. His life was threatened when he was fourteen, but his fellow gang members protected him. After completing eighth grade, the Defendant's mother brought him back to her home in Pulaski.

The sentencing memorandum stated that the Defendant was unhappy in Pulaski and was singled out because of his appearance and dress and because he was from Chicago. His mother sometimes banned him from her home, and the Defendant stayed with his father or friends. The Defendant worked part time while in high school. When the Defendant was seventeen, his mother died. He became reclusive and committed an assault three months after his mother's death. A few months later, he was arrested for aggravated robbery and learned that the charge was related to the earlier assault incident because another person involved had taken jewelry from the victim. He was charged with other aggravated robberies because his car was used by others for the robberies. The Defendant entered "best interest" guilty pleas to the charges and served an eight-year prison sentence.

The memorandum also states that the Defendant was identified as a gang member when he entered the Department of Correction. He received several disciplinary actions, but only one was for assaultive behavior. The Defendant eventually withdrew from interaction with other gang members while serving his sentence.

The memorandum states that the Defendant moved to Chattanooga and married a childhood friend shortly after he was released from prison. He worked temporary jobs and

then found a full-time position in July 2006, but he was fired after he cashed duplicate paychecks that were sent to him in error. He began a relationship with seventeen-year-old Sasha House and impregnated her. After losing his job, the Defendant decided to sell marijuana due to financial pressures.

The memorandum states the Defendant's version of the crime: He met the victim, who was known as a "big time" drug dealer, with $1,100 and a borrowed .45 caliber handgun. The victim asked to see the money and said he would have to call an associate to deliver the marijuana. The victim made a call on his cell phone and then suddenly bent over, picked up a rock, and struck the Defendant's head. The Defendant fell to his knees but then stood up and pulled out his gun. He chased the victim down a ridge and through a wooded area. The Defendant was angry and stunned. When the Defendant saw the van with an open door, he thought he was being ambushed. He fired shots at the victim and then ran to the woods.

The statement notes that the Defendant had not received any disciplinary actions in his two years in the Hamilton County Jail. He first became a Muslim in jail but later became a Christian. The Defendant began leading daily Bible study and prayer with other inmates who had been associated with four different gangs. The Defendant wanted to convert others to Christianity. The Defendant and his wife remained married, despite her initial anger over his relationship with Ms. House. Jail volunteers submitted letters that were supportive of the Defendant.

In sentencing the Defendant, the trial court found that the Defendant had a previous history of criminal convictions or behavior in addition to those required to establish his Range II classification. See T.C.A. § 40-35-114(1) (2006) (amended 2007, 2008). The court noted that the Defendant had four aggravated robbery convictions and that only two were required to establish a Range II classification. The court also noted the Defendant's criminal behavior in cashing another person's paycheck, drug use and assault during his previous prison sentence, gang involvement, and an illegal sexual relationship with a minor. The court gave the factor significant weight given that the present crime also involved criminal activity arising from a drug transaction and use of a firearm.

The court also found that the Defendant employed a firearm in the commission of the offense. See id. § 40-35-114(9). The court weighed this factor heavily given the Defendant's previous aggravated robbery convictions involving a weapon.

As mitigating proof, the court found that the Defendant assisted the authorities in locating or recovering property involved in the crime. See id. § 40-35-113(10) (2010). The court noted that the Defendant helped the police find the gun. The court also noted that the

Defendant admitted shooting the victim but noted that the Defendant's statement to the police was of questionable credibility overall.

The court also found that the Defendant was truly repentant for his crime. See id. § 40-35-113(13). The court noted, however, that the Defendant still minimized his culpability in his allocution, referring to it as "reckless" despite the State's proof. The court also noted that the Defendant had a supportive family, abandoned his gang lifestyle, was a model prisoner, and devoted time to religious pursuits. See id.

The court stated that it gave the enhancement factors greater weight than the mitigating factors. The court found that based upon the enhancement factors, the proper sentence would be forty years but that the mitigating proof afforded a five-year reduction. The court imposed a Range II, thirty-five-year sentence to be served as a Violent Offender.

Turning to the Defendant's argument on appeal, he contends that Range II sentencing requires at least two but not more than four qualifying convictions and that because he had four convictions, the trial court erred in applying only two of his convictions to Range II classification and the other two to enhancement factor (1). See T.C.A. § 40-35-106(1) (2006) (amended 2009, 2010). The Defendant argues that the statute is ambiguous and that the ambiguity should be interpreted in his favor. We disagree. The language of enhancement factor (1) states, "[T]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range." Id., § 40-35-114(1) (emphasis added).

With respect to the length of the sentence imposed within Range II, the record reflects that the trial court followed the statutory procedures in arriving at the sentence. The record likewise reflects that the trial court was heavily swayed by the Defendant's extensive criminal history, noting that the Defendant had numerous instances of criminal behavior in addition to the aggravated robbery convictions and his use of a deadly weapon in the offense. In declining to give the mitigating factors great weight, the court relied upon its determination that despite the Defendant's efforts to improve himself, he still minimized his culpability for the victim's murder despite significant evidence to the contrary. Upon review, we conclude that the Defendant has failed to show that the lengths of his sentences are inappropriate or that the trial court failed to consider the sentencing principles and all relevant facts and circumstances when imposing his sentences. The Defendant is not entitled to relief.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE